*Exhibit D*

Pages 1 - 66

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

```
INTEL CORPORATION and APPLE INC.,  )
                                   )
              Plaintiffs,          )
   VS.                             ) NO. 19-cv-07651 EMC
                                   )
FORTRESS INVESTMENT GROUP LLC,     )
FORTRESS CREDIT CO. LLC, UNILOC    )
2017 LLC, UNILOC USA, INC., UNILOC )
LUXEMBOURG S.A.R.L., VLSI          )
TECHNOLOGY LLC, INVT SPE LLC,      )
INVENTERGY GLOBAL, INC., IXI IP,   )
LLC, and SEVEN NETWORKS, LLC,      )
                                   )  San Francisco, California
              Defendants.          )
_____)
```

Tuesday, December 15, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:  (By Zoom Webinar)

For Plaintiffs:

        WILMER CUTLER PICKERING
          HALE AND DORR, LLP
        2600 El Camino Real
        Suite 400
        Palo Alto, California  94306
   **BY:  MARK D. SELWYN, ESQ.**

        WILMER CUTLER PICKERING
          HALE AND DORR, LLP
        60 State Street
        Boston, Massachusetts  02109
   **BY:  WILLIAM F. LEE, ESQ.**

Reported By: **BELLE BALL, CSR 8785, CRR, RDR**
        Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED**:

For Plaintiffs:
>                 WILMER CUTLER PICKERING
>                   HALE AND DORR, LLP
>                 1875 Pennsylvania Avenue, N.W.
>                 Washington, D.C.  20006
>            BY:  **AMANDA L. MAJORS, ESQ.**


For Fortress Defendants and VLSI Technology LLC:
>                 IRELL & MANELLA, LLP
>                 1800 Avenue of the Stars
>                 Suite 400
>                 Los Angeles, California  90067-4276
>            BY:  **A. MATTHEW ASHLEY, ESQ.**
>                 **MICHAEL D. HARBOUR, ESQ.**
>                 **OLIVIA L. WEBER, ESQ.**


For Defendant Seven Networks, LLC:
>                 MCKOOL SMITH P.C.
>                 104 East Houston Street
>                 Suite 300
>                 Marshall, Texas  75670
>            BY:  **SAMUEL F. BAXTER, ESQ.**


For Defendant INVT SPE LLC:
>                 ROBINS KAPLAN LLP
>                 800 LaSalle Avenue
>                 Suite 2800
>                 Minneapolis, Minnesota  55402
>            BY:  **CHRISTOPHER A. SEIDL, ESQ.**

For Defendant IXI IP, LLC:
>                 CALDWELL CASSADY AND CURRY
>                 2121 North Pearl Street
>                 Suite 1200
>                 Dallas, Texas  75201
>            BY:  **JASON D. CASSADY, ESQ.**

1   <u>**Tuesday - December 15, 2020**</u>                              <u>**1:34 p.m.**</u>

2                        P R O C E E D I N G S

3        **THE CLERK:**  Court is now in session, the Honorable

4   Edward M. Chen is presiding.

5        Calling Civil Action 19-7651, Intel Corporation, et al.

6   versus Fortress Investment Group, LLC, et al.  Counsel, please

7   state your appearances for the record, beginning with

8   plaintiffs.

9        **MR. LEE:**  Good morning, Your Honor -- good afternoon,

10  Your Honor.  Bill Lee, Mark Selwyn and Amanda Major from

11  WilmerHale for Intel and Apple.

12       **THE COURT:**  All right.  Thank you, Mr. Lee,

13  Mr. Selwyn, Ms. Major.  Good afternoon.

14       **MR. ASHLEY:**  Good afternoon, Your Honor.  Matt Ashley

15  of Irell and Manella.  And with me today are Michael Harbour

16  and Olivia Weber.

17       Morgan Chu could not make it because he is currently

18  arguing another hearing in the *VLSI versus Intel* matter.

19       **THE COURT:**  All right.  Well, maybe we should join

20  those hearings.  They seem like they could be related in some

21  way.  All right.  Well, welcome Mr. Ashley, Mr. Harbour,

22  Ms. Weber.

23       Well, let me get to what I think is kind of the core of

24  this.  I've actually gone over the complaint.  So I have some

25  familiarity with it, notwithstanding its 134 pages of length,

1    and the additional detail that is added in there.  But there

2    are still -- I have some, some, some questions.

3         And I want to talk about the plaintiffs' argument about,

4    quote, "direct evidence of anti-competitive effects" because

5    that informs the definition of the market and how robust that

6    must be, et cetera, et cetera.  But I think that underpins a

7    lot.  That's really where the rubber meets the road in many

8    ways.

9         And, you know, generally you have to show

10   supra-competitive pricing and reduction or -- and/or -- there's

11   some dispute about that -- reduction in output.  But

12   above-market pricing obviously is a key to this.

13        And when I search the complaint, I'm still left with

14   questions.  Number one, about how is supracompetitive price

15   defined in some way, how's it determined, and how's it

16   evidenced?

17        And with one exception -- and maybe I missed it.  There is

18   a recitation, for instance, that -- well, here, let me tell you

19   what I think the evidence is, and perhaps the plaintiffs can

20   tell me if I miss something.

21        Number one, there are the general allegations that sort of

22   recur for each of the various technologies that the prior

23   patent owners, prior to being acquired by the defendants,

24   didn't enforce -- for the most part, didn't enforce -- many of

25   these patents were left sort of unenforced, and sort of were

1    there.  And then, once they're picked up, they get folded into

2    a litigation strategy.  An aggressive litigation strategy.

3       The second piece of evidence is that there were some, in

4    some cases, some transactions involving maybe a group or

5    portfolio of patents that were licensed or sold at one point,

6    and looks like at a much cheaper rate than what is being

7    demanded in litigation.

8       I mean, those seem to be -- because there is no

9    information, because of confidentiality problems, of what

10   actual licensing rates have been under the new regime, what

11   kind of concessions are actually being extracted.  We have no

12   hard numbers in that regard.

13      The only thing we know about the current regime is sort of

14   the demand, the litigation demand of the patent holders, the

15   new patent holders.  But we don't have any other information.

16      So just at the 40,000-foot level, am I missing something

17   in terms of evidence of supracompetitive pricing?

18          **MR. LEE:**  Your Honor, this is Bill Lee.

19      I would never suggest that you're missing something, but I

20   think there is more there than your summary might indicate.

21   And part of this is we have given you what we can give you, for

22   sure.

23      But, to give you a sense of the evidence we have of the

24   supracompetitive royalties and demands -- and Your Honor, as

25   Your Honor has said, there can be an antitrust injury if --

1   what you have to do is defend yourself against these

2   supracompetitive demands and supracompetitive royalty demands.

3   So these things are related.  But there are a couple of things,

4   Your Honor.

5        If I can have the slides, Ms. Major, that we have, and go

6   to Slide 13.  That's the best place to start.

7        (Document displayed)

8        **MR. LEE:**  So let's start at slide 8.

9        (Document displayed)

10       **MR. LEE:**  Slide 8 has a very specific example,

11  Your Honor.  And if I could do the logical progression for you

12  because I think it -- it answers your question in the

13  abstract.  Probably doesn't provide the answer or the details

14  you want.

15       (Documents displayed)

16       **MR. LEE:**  So slide 8 concerns the '303 patent.  If I

17  go back to slide 3 --

18       (Document displayed)

19       **MR. LEE:**  -- the '303 patent exists in what we have

20  defined as the MOSFET channel fabrication market.

21       If I take to you slide 4, we have specifically identified

22  patents that are substitutes with alternative technologies.

23       (Document displayed)

24       **MR. LEE:**  If I take to you slide 5, we've identified

25  the acquisition history.

1          (Document displayed)

2          **MR. LEE:**  And then slide 6, we have described five

3    substitutes, why they're substitutes, and the fact that

4    aggregation of them eliminates competition.

5          (Document displayed)

6          **MR. LEE:**  Then if we go to slide 7, Your Honor, we

7    have the first portion of the evidence that you've identified,

8    which is:  Because of constraints that existed on the prior

9    owners, the patents were never asserted, never enforced, not

10   licensed.  But then after aggregation, VLSI sues.

11         And on slide 8, if we now move to that, --

12         (Document displayed)

13         **MR. LEE:**  -- we have that VLSI has sued on the '303

14   patent.  And then I'll just refer to the paragraph that

15   Your Honor can see in the bottom right-hand corner,

16   Paragraph 335, where we have the specific details of the

17   supracompetitive demands, that they're no relationship to what

18   the prior owners did, what the acquisition prices were of the

19   patents.  And those supracompetitive demands result in a

20   direct injury, because the Intels and Apples of the world have

21   no choice but to either capitulate or defend themselves

22   against those claims.

23         Now, Your Honor is correct that because VLSI -- I'm

24   sorry -- because Fortress and the PAEs have basically engaged

25   in a -- what I call a web of shell companies, but at least a

group of shell companies.  Without the discovery, it's hard to
disassemble.  But we do know more.  And then, if I take
Your Honor to Paragraph 247 of the complaint --

       **THE COURT:**  Let me stop you there for a minute,
Mr. Lee.

       **MR. LEE:**  Sure.

       **THE COURT:**  This -- this instance and one other
instance I will say, having gone through the complaint, do
provide examples where there was a prior licensing or
transaction which clearly involved a patent in the litigation
strategy.

      So here in your Paragraph 335, it talks about the
Freescale offer of Intel for a $10 million license that
included the '303.  Okay?  And that is a stronger case.  That
is one case where you do have something.  You actually show the
'303 was up for sale at one point, or -- whether license or
sale, whatever.  And then you can compare that with the
current, you know, post-regime, the current regime sort of
litigation price.

      And, and there was one other, I think, instance where that
occurred where I saw that the -- the patent was also at issue
in a sale.  There's reference to the same patent.  So I saw
that maybe twice amongst all the various -- you know, in the
various categories that you have.  But many of the others talk
about the sale of a portfolio or licensing for other patents.

1  I didn't see the overlap between the patents at issue in the

2  litigation strategy of which you are now complaining and the

3  pre-acquisition transactions.  There, it looks like apples and

4  oranges.

5      So --

6          **MR. LEE:**  Thank Your Honor.

7          **THE COURT:**  -- I will admit that this one is one of

8   your stronger ones.

9          **MR. LEE:**  And Your Honor, the answer is we have more,

10  and we know there are more.  And if I took you to Paragraph

11  247 of the complaint, and slide No. 16.

12      (Document displayed)

13          **MR. LEE:**  And Your Honor, this is a place where I

14  know what has been revealed in the VLSI case.  I know what the

15  damages claims are.  I know what the acquisition cost was of

16   the fins.  And I know the relationship between the two.

17      And we asked the defendants whether we could reveal that

18  information to you, under seal.  Because if we could, we would

19  have ten or eleven examples that are the same as the one you

20  just described.  So, they said no.  I'm not quite sure why

21  revealing to you, under seal, and only you, under seal, is  a

22  problem.  But what we could do is allege what we allege in

23  Paragraph 247.

24      And for this group of patents, we know at what prices they

25  were offered before.  We know at what prices they were

1    purchased.  We know that after they were purchased for

2    relatively small amounts, there were these enormous damages

3    claims, which we could give you, specifically.

4         And so I --

5              **THE COURT:**  Were these --

6              **MR. LEE:**  I'm sorry.

7              **THE COURT:**  Were these patents offered for sale --

8    because you go through the NXP offer for sale, and a number of

9    patents that were sold for X million dollars.  I -- maybe I

10   missed it.  But they seem to be different patents than those

11   identified in Paragraph 236, which are the substitute patents

12   that are part of the aggregation.

13             **MR. LEE:**  That --

14             **THE COURT:**  The '687 the '850 and the '983, are they

15   somewhere in these earlier portfolios that were offered for

16   sale?

17             **MR. LEE:**  So Your Honor, the answer is the '983

18   patent is within those earlier offers.  So we are taking the

19   shared memory patents, which we've identified for you

20   specifically.  That is one of the patents.

21        So to go back -- I may have to go back to slide 14.

22        (Document displayed)

23             **MR. LEE:**  So this '983 patent which is referred to in

24   Paragraph 247, if we go back, is part of the shared memory

25   access patent market.  There is a specific allegation

1     concerning the '983, the specific allegation of the other

2     substitute patents.

3         And I then take this slide 15.

4         (Document displayed)

5         **MR. LEE:**  There is a specific description of them as

6     economic and technological substitutes.  But then, when we get

7     to being able to demonstrate to you what has happened once

8     it's gotten into the hands of the Fortress PAE, we haven't

9     been able to do so, because it is under seal.

10        The acquisition prices are set forth in Paragraph 247.

11    But the damages demands that resulted or the supracompetitive

12    royalty demands that resulted we have not been allowed to show

13    you.

14        So --

15        **THE COURT:**  Let me ask you.  247, you say that --

16    we're focusing on the '983, right?  And I'm comparing that to

17    the January 2014, the December 2014, and December 2014 offers.

18    So I don't see the '983 amongst those patents that are listed

19    that were offered for sale, but you're saying they are the

20    functional equivalent or something?

21        I'm missing something.

22        **MR. LEE:**  Yes.  The answer is yes.  And if you look

23    at the first part of Paragraph 247, right, where -- we have

24    asked for permission to disclose to you the financial terms of

25    the purchases from NXP, so we could give you precisely that

1    information.  And then I could give you precisely the demand

2    that's been made under the '983.  But they've said no.

3        But what we have been able to show you is for patents in

4    this area, or in this market, what the offers for sale have

5    been for portfolios of patents.  And then after those sales --

6    after those offers have been made and after the aggregation of

7    the patents as described in these paragraphs, the end result is

8    the supracompetitive licensing demands, which we could provide

9    to you if the defendants, if VLSI would say it's fine to

10   provide it under seal.

11       **THE COURT:**  But my question before we get there is:

12   Are we comparing apples and oranges when we talk about the

13   '983 versus the '126, '472, '382, the '054 that were sold or

14   offered for sale in January of 2014?  What's their

15   relationship?

16       These seems to be different -- when you look at the

17   description, they seem to be a different subject.

18       **MR. LEE:**  Let me make sure I'm focusing on what you

19   are.  Are you focusing on the second half or the bottom

20   portion of the paragraph that's on Page 77?

21       **THE COURT:**  I'm -- sort of the mid-point of 77, you

22   go through and describe three transactions in which NXP

23   offered to sell Intel various patents.

24       **MR. LEE:**  Yes.

25       **THE COURT:**  And the first group in January, '14

1    included the '126, the '472, '382 and the '154.  So my

2    question is:  How, how are those related to the '983?

3        In other words, maybe those weren't worth that much.

4    Maybe those were -- you know, I have no idea why those -- that

5    sale price would have any indicative value or probative value

6    as to the value of the '983.

7            MR. LEE:  I understand the question now.  So

8    Your Honor, you have to go back to Paragraph 234, and start

9    with this specific market that we've defined, this shared

10   memory access market.

11           THE COURT:  Yeah.

12           MR. LEE:  And look at what's described as being in

13   the shared memory access market, which includes

14   multi-processor electronic devices with shared memories.  And

15   then, if we take this through the patents, the specific

16   patents we've identified are all patents that we say are in

17   that market.  And then when we get to 247, we're not comparing

18   apples and oranges.  We're comparing the shared memory access

19   market patents to patents that are in the same area of

20   technology, so that you have some sense of what the demands

21   are.  We had to give you these, because they've declined to

22   allow us to show you the precise purchase price for the '983.

23       And so I know this is -- it sounds redundant, but we're

24   doing what we can, only because they are refusing to allow us

25   to tell you precisely the purchase terms of the '983 and

```
 1   precisely the demand --

 2              THE COURT:  Well --

 3              MR. LEE:  -- all of which I have.  All of which I

 4      have.

 5              THE COURT:  Well --

 6              MR. LEE:  So what we have to say to Your Honor is in

 7      order to address the issues that Your Honor raised in your

 8      order is to say: Look, we can't tell you what the purchase

 9      price was for the '983.  But we know.  We can't tell what you

10      VLSI did with it after they acquired it, but we know.  But

11      here is what we can tell you, based upon what we know, for

12      patents that are in the same general area as these shared --

13      as this specific submarket that we described as the shared

14      memory access.

15          And that's what we've done.  We've said: Here is the best

16      evidence we have that we're allowed to share with you.  But, we

17      have more specific evidence that is precisely the acquisition

18      price for these patents.

19          So to be clear, Your Honor, it's -- we have the

20      acquisition price for each of the patents acquired by VLSI.  We

21      have the damages demands for each of them.  They -- we've made

22      the request to be able to disclose that to you in the complaint

23      to seal, and the answer's been no.  So we have done the best we

24      can.  And we've given you the specific example that Your Honor

25      identified.  We --
```

1          **THE COURT:**  Let me ask you, Mr. Lee.  First of all,

2     even if you do the best you can, that doesn't mean that's

3     enough.  And so when I look at this, one could ask:  Well,

4     these three portfolios that were offered for sale, yeah, maybe

5     they're in the same field, the general same field.  But I have

6     no idea how much they contribute to, you know, the various

7     products.

8          In other words, are there alternatives to these?  Let's

9     say the four patents, the 126, the '472, the '382 and the '054,

10    such that they're only worth as package three to four million

11    dollars, or maybe they're outdated and -- you know, without

12    knowing anything more, it's a bit of a leap to say:  Well, this

13    portfolio -- these three portfolios kind of indicate what the

14    current value is in this field.  And, you know, maybe it has

15    some value, I don't know, in terms of evaluation.  But it's --

16    it seems like a leap.

17         Now --

18         **MR. LEE:**  Your Honor, if I could --

19         **THE COURT:**  Yeah.

20         **MR. LEE:**  It's not a leap, for this reason.  And

21     here's a specific reason why.

22         When I say we've done the best we can, what I mean is we

23    have told you what we're allowed to tell you, without the other

24    side agreeing that we can file under seal the specific

25    information we have.  And what we have said in the complaint

and what I can say to you now is for each -- for instance, of

the VLSI patents, I have the specific acquisition price

information.  For most of them, I have the specific demand

that's been made in a court proceeding.  And they are not

magnitudes different, but magnitudes upon magnitudes different.

I can't reveal that to you because we asked for permission

for it.  But we know it's there, we know we have discovery --

we'll get it under discovery here, under a protective order.

We know that we'll be able to show it to you then.

But in order to respond to Your Honor, I had to do the

next best thing since they won't allow the information to be

disclosed to you.  So the next best thing -- and I think it

should be sufficient -- is to tell you that we have the

information.  To tell you that if we're allowed to file it

under seal, we'll show it to you.

And then say: And, as an indication that the allegations

we're making are in fact correct, and as an indication that the

information that's under seal would substantiate the

supracompetitive royalties and the anti-competitive effects,

here are what we do know about patents in the microprocessor

feature area and the prices at which they were sold.

So, I understand what Your Honor is saying.  They're not

the same patents.  But I think the allegations are -- if you go

back to the one example that you said you thought had the right

analytical discipline, what we're trying to say to you is we

1   know that there are many more.  And we know of them,

2   specifically.  And we know that we could tell you about them.

3   But since we couldn't, when I say the best we could do, the

4   best we could do is tell you that we have the information, and

5   we could disclose it under seal, and tell you the best

6   information we have about patents and their selling price in

7   the same general area as the patent at issue.

8        **THE COURT:**  Let me ask you, when you say the best

9    that you can do, one of the responses I think in the reply is

10   that:  Well, you could ask the court in which the -- that has

11   the jurisdiction over the confidential records for relief.

12    You know, what about that?

13        **MR. LEE:**  Your Honor, I think that if -- the answer

14   is we could do that.  And if this case proceeds, we will do

15   that, if they're not willing to produce it in this case.  It's

16   in multiple cases.  We have the information.  We could ask

17   them for relief to put it here.

18    Candidly, I thought the easiest thing to do was to ask

19   counsel, and say: Can we disclose it to His Honor?

20        **THE COURT:**  Right.  And they've said no.

21        **MR. LEE:**  And they said no.

22        **THE COURT:**  And, and, and I don't have jurisdiction,

23   right, over -- I don't have the power to order the disclosure.

24        **MR. LEE:**  Actually, Your Honor, you would.  There's

25   no reason that you could not order disclosure.  Assuming that

1    we're proceeding in the litigation, assuming that we made a

2    discovery request for this information, there's no reason that

3    you couldn't order disclosure of the demands that were made.

4         You certainly could order disclosure of the purchase

5    prices of the patents that were made.  The purchase price of

6    the patents, when the patents were purchased by the Fortress

7    entities.  You certainly could order that.

8         And I think -- you know, the question Your Honor, in part,

9    is this:  Given what we've said in the complaint, given the

10   specific instance or instances that we've described to you,

11   given that we have told you that under seal there are multiple

12   other examples, is that a sufficient notice pleading under

13   12(b)(6) for the case to proceed?

14        And it should be.  And the reason it should be,

15   Your Honor, is if it isn't -- and I would ask Ms. Major to go

16   back to slide No. 12.

17        (Document displayed)

18        **MR. LEE:**  If it isn't, we're using Rule 12(b)(6) to

19   reward the Fortress Group for this really complicated set of

20   shell companies and PAEs.  And then, having employed or

21   deployed this complicated web of companies, to enter into a

22   series of negotiations which they claim are under seal, a

23   series of litigations where they are claiming that demands

24   made are under seal, we're rewarding a -- a scheme of

25   obfuscation by saying no one can get at it.  That can't be the

1    right result.

2              THE COURT:  Well, let me ask.  With respect to the

3    shared memory access market, you do state at Paragraph 247

4    that the damage statements VLSI have disclosed publicly is

5    that they would seek, you know, 7.1 billion against Intel,

6    billions involving eight patents, and billions in a suit

7    involving five patents.

8         Is that -- how is that related to the '983?  Is that

9    involving a different action?  Or --

10             MR. LEE:  There are -- so the '983 is -- I'm sorry.

11   '983 is asserted in one action, Your Honor.  And in that

12   action, the damages -- there was a preliminary disclosure of

13   the damages that were claimed.

14             THE COURT:  Yeah.

15             MR. LEE:  And the preliminary disclosure indicated

16   damages of $7.1 billion, across a series of patents.

17             THE COURT:  Okay.

18             MR. LEE:  In the other cases -- the California action

19   has been stayed pending a series of reexamination -- of -- of

20   IPRs.  The other cases, both in Delaware and in Texas, the

21   cases have proceeded further.  So now there is a specific

22   damage claim, by patent.

23        So we have and can provide you a specific acquisition

24   history for each of these patents.  We've actually described

25   the acquisition history as best we can in the complaint.  We

1    have specific information on the acquisition prices.  We have

2    specific information on the supracompetitive royalties that

3    were demanded.  And it would give you multiple examples across

4    several of these 13 exemplary markets that we've identified for

5    you.  And we would suggest that that -- we would urge the Court

6    to find that that's enough to proceed.

7              **THE COURT:**  Well, you're asking me to proceed on the

8      basis of a representation that the royalty demands now far

9      exceed by orders and orders of magnitude the acquisition

10     price.  And that's your indication of supracompetitive

11     pricing.

12       Is that basically the idea?

13              **MR. LEE:**  That's the idea for the specific ones we've

14     been talking about.  There are other allegations in the

15     complaint that concern other cases.

16       For instance, if you -- if you look at the supplemental

17   authority we've provided to you with the case involving Uniloc

18   where if you just read the disclosures, they were able to

19   collect in the tens of millions of dollars, $14 million or so,

20   for a patent or patents that were ultimately held to be invalid

21   or not patentable.  There are -- these are just examples that

22   we're providing to you.

23       And I think that, as I said, the question is:  Having

24   provided the 13 exemplary markets, having taken each of them

25   and walked through the manner in which the patents were

1    acquired, the manner in which they substitute for each other,

2    the manner in which they're aggregated, and then what was done

3    with them after aggregation.

4          You know, Your Honor, without disclosing any confidential

5    information, I can tell you that among the examples that could

6    easily be provided to you are patents that are more than a

7    decade old, where the original patentee did nothing with them,

8    and then a decade later they were acquired by one of the

9    Fortress PAEs.  And within a year, the damage or the royalties

10   demanded from just one -- just one respective defendant --

11   exceeded by magnitudes upon magnitudes upon magnitudes the

12   acquisition price made just a year or two before.

13         **THE COURT:**  Why can't, for instance, the plaintiff

14   provide -- I know it's premature to bring in experts, but

15   typically -- couldn't you bring in somebody and provide the

16   basis of some allegations, for instance, that says -- not just

17   compared to acquisition price.  Because acquisition price, you

18   know, sometimes you pick up a deal.  That's not necessarily

19   market value.

20         But I mean, why isn't there any allegation in here that

21   says the 7.1 billion sought in the Intel suit involving the

22   eight patents or the billions against Intel involving the five

23   patents so far exceed -- I mean, you know what the patents are.

24   You know, at some point you can bring in an expert to know, you

25   know, what their function is in the marketplace and how

1  critical they are, how essential they are, how easy it is or

2  how hard it is to design around, what the magnitude of the

3  sales in that particular industry are, et cetera, et cetera,

4  and come up with some estimate to say:  You know, this thing's

5  really only worth, at best, $20 million and here they are

6  because of -- I mean, right now, I just -- it's like taking a

7  stab in the dark.

8            **MR. LEE:**  Your Honor, the answer is we will do that.

9   But the question is, right now, whether we can get to the

10   point where we can have that expert look at the information

11   that I've described to you.

12       And if we just use Paragraph 247 as an example, if you go

13  from 247 to 248, there are three important concepts here that

14  should be sufficient for the motion to dismiss.

15       The first is for the '983 patent, we say we can -- we know

16  what the financial terms were for the purchase of the patent.

17  We can't tell you, because they refuse to consent.  We can tell

18  you what they have publicly disclosed as the estimate for

19  damages that includes the '983.  And it's $7.1 billion.

20       We can tell you what the acquisition prices were for other

21  patents from these same original patentees, the patentees who

22  did not assert them, and give the range.  I'm not going to say

23  what the range is, because those are still under seal.

24       And then we say:  Based upon this information, we allege

25  that the supracompetitive licensing returns that Fortress PAEs

1    have sought are evidence of market power and the

2    anti-competitive effects.  And then we say specifically, for

3    example, at the bottom of Page 77 (As read):

4              "VLSI has sought exorbitant royalties from Intel,

5              even though those prior owners of those patents made

6              no similar attempt to enforce those patents."

7        Your Honor, those are allegations -- we will have experts

8    to support them.  I know that we'll have evidence to support

9    them more than you normally would, because I know what the

10   information is under seal.

11       For many of the cases that we've described to you where

12   Intel and Apple have been the defendants, we know what the

13   acquisition prices are.  We know what the demands are.  That's

14   why we can, in good faith, make the allegation that's in

15   Paragraph 248.  And it's related as to the other 13 exemplar

16   markets.

17           **THE COURT:**  Well, there's a couple of comebacks to

18    that as well that you can maybe anticipate.  One is:  Demand

19    is demand.  That's not an actual -- that's not what you get.

20    You can demand all you want, and of course, you know, in court

21    sometimes we see exorbitant demands that then settle for a

22    tiny fraction of, you know, of what is originally demanded.

23    So demand is only so much.

24       If you actually had licensing or settlement numbers -- and

25    of course you run into the confidentiality problem there --

then you could see that they were able to extract exorbitant
supracompetitive royalties.  But right now, a demand is only a
demand.

          **MR. LEE:**  Your Honor, I don't think that that's
correct.  I don't think it's actually consistent with your
order, because you found or you held that incurring the
expenses of defending yourself against these supracompetitive
demands could be an antitrust injury.

     It can't be that you have to capitulate to the demands in
order to have an antitrust injury.  You, yourself, described it
as a choice.  That the defendant suggested we have to make a
choice in order to have a claim.

     When you have these exorbitant demands, and they're made,
for instance, by Uniloc in 25 cases filed over a couple years
against Apple, or VLSI which has asserted in multiple cases 23
patents against Intel, those exorbitant demands can be made in
part because of the aggregation, and in part because of the web
of entities that now hold the patents.  And then they can be
used to make the exorbitant demands that have two consequences.

     One is it requires them to make the choice that Your Honor
described in your own order between capitulating or defending.
And if you capitulate to the supracompetitive royalty demands,
that's antitrust injury, and a direct anti-competitive effect.
If you don't capitulate and you defend yourself, even if you
ultimately prevail, Your Honor, even if you ultimately prevail,

```
1   it's still an injury, because that's what you've had to do to
2   defend against the result of the aggregation.
3       That's the reason that these patents are -- these -- the
4   aggregated patents are pursued in the manner that they're
5   pursued.  The supracompetitive demands are what require the
6   defendants -- the plaintiffs here, the defendants in the
7   cases -- to defend themselves, to incur really substantial
8   legal expenses.  And then ultimately say to themselves, giving
9   you an example, I'm Intel.  VLSI has aggregated 23 patents it
10  sued us on serially.  It has no business other than suing
11  Intel.  It's claiming billions of dollars of damages for
12  multiple patents.  Are we just going capitulate?  Or are we
13  going to try to defend ourselves against each and every one of
14  them?
15      If you choose --
16      THE COURT:  Let me ask.  The intensity of that
17   dilemma or the depth of that dilemma turns, in part, on how
18   much they have you over a barrel, which turns on what the
19   availability of substitutes are.
20      So one of the arguments the defendants have is that
21  there's no assertion.  You've identified, for instance, three
22  patents in any particular field, say these are substitutes.
23  And then you've identified:  Here's four complements.  But what
24  you have not said is:  What's the rest of the field?  Are there
25  other substitutes out there that -- if there are no substitutes
```

1  out there, you know, then you say that, and you say:  This is

2  the game.  These three substitutes, this is the way you get to

3  the shared memory, or this is the way you get to the, you know,

4  cache management.  Or this is the way you get to the shared

5  voicemail thing.  Or -- there's a big difference between that's

6  the game or there's 20 other alternatives out there.  And that

7  will affect the likelihood that what you're capitulating to or

8  the dilemma that your clients are facing is really an

9  anti-competitive dilemma.

10      So what about the fact that there doesn't seem to be any

11  description of what -- the other alternatives, or whether these

12  are the only alternatives.

13          MR. LEE:  Your Honor, I think the answer is two

14  things.  One legally, one factually.  Legally, I don't there's

15  a requirement that these patents be the only alternatives.

16  The only question is whether aggregation of these patents in

17  the particular markets that we've identified results in an

18  anti-competitive effect.  So legally, I don't think we have to

19  identify all the other alternatives.

20      We do have to say that these are substitutes, and they are

21  all alternatives.  And we have not only alleged that

22  specifically, but we've described specifically the reason they

23  are.  And we've described specifically the reason that before

24  aggregation, you had different choices.

25      So for the MOSFET channel fabrication method we've said:

here are two alternative ways to do MOSFET fabrication.  After aggregation, right, there is no competition between these two. So that's the legal answer to your question.

        THE COURT:  Well, but isn't it relevant, how many other alternatives?  Yes, they've taken out two, but there's a big difference between taking two out of two versus taking two out of 50.

        MR. LEE:  Your Honor, if you took two out of two or two out of ten or two out of 20, but the two you took are substitutes for each other, and the fact that you took those two out gave you enough market power to engage in anti-competitive conduct, that's enough.  It doesn't matter that --

        THE COURT:  That market power turns on how many alternatives there are.  I mean --

        MR. LEE:  I don't think, Your Honor, that's correct. I think it depends upon the power of the alternatives.  I mean, you could have 50 patents in a particular area, and three or four or five of them could be the key, the crown jewels.

        THE COURT:  Right.

        MR. LEE:  And the aggregation of those could have an enormously anti-competitive effect.

        THE COURT:  That's exactly my question.  Are these the crown jewels?  I don't see that.  You said:  Well, here

1    are three of them that -- you've identified in that regard, I

2    guess, five in the MOSFET channel fabrication.  Other areas,

3    you've identified three.

4        How do I know that these are the crown jewels or a good

5    part of the crown jewels that -- that -- once you monopolize

6    and aggregate those, you've got people over a barrel.

7            **MR. LEE:**  Your Honor the answer is -- if I can go to

8    slide 8.

9        (Document displayed)

10           **MR. LEE:**  The answer is that -- what the conduct was

11   before and the conduct was after.  For these patents, before,

12   the patent owners never asserted them, never enforced them,

13   never licensed them.  After aggregation, they were asserted,

14   and attempted to be enforced with damage demands that exceed

15   by magnitude upon magnitude upon magnitude the acquisition

16   price.

17       Now, in this particular instance, we could give you some

18   details that are in the complaint because we had those details,

19   and they weren't subject to any other protective order.  But

20   that's the answer.  When you ask how do you know that they're

21   important, look at the consequence of what's happened after

22   aggregation.

23       And it's -- it's really -- and I apologize for being ever

24   so slightly redundant.  But it's very simple, I think.  You

25   have these patents that no one ever enforced, no one ever

1    licensed, never sued on.  Even though they're patents that you

2    were held by, in Intel's case, competitors, right.  The patents

3    sit there for five years, six years, seven years, a decade.

4        Then the patents are aggregated with a non-practicing

5    entity.  And non-practicing entity and its related companies

6    aggregate not just a patent, not just a variety of patents, but

7    patents that are specifically designed -- that are specifically

8    substitutes for each other.  And then, what's the result of

9    that?

10       That's the difference between direct and circumstantial

11   evidence of market power.  We are alleging that you have direct

12   evidence of the market power, because Fortress is asserting

13   that direct -- that evidence.

14           **THE COURT:**  Well, let me ask you.  You're asking for

15   an inference to be drawn from the fact that prior owners

16   didn't assert, and then once aggregated, there was this

17   massive assertion, aggressive litigation, and that shows you

18   that the -- that the increase in sort of value or asserted

19   value resulted from the aggregation, and not from other

20   factors such as, you know, you identified as competitive --

21   natural competitive factors, you don't want to sue your

22   competitor -- you know, other inhibitors that perhaps devalued

23   for the prior patent holder the true value of the patent.

24       But let me ask you as an example, I'm looking at

25   network-based voice messaging, starting at Paragraph 127.  And

1    in Paragraph 142, it appears that the prior owner of the '252

2    is Philips.  And that Ayalogic and then Empire IP owned the

3    '5890, the '433, the '723 and the '622.  So it appears that

4    Ayalogic and Empire had four of the five patents.  The only

5    real aggregation occurred when you combined the '252.

6        Now, I don't know how much, you know, that became -- that

7    was the straw that broke the camel's back.  In other words, the

8    other four patents by themselves really didn't do much, they

9    weren't the crown jewels, they didn't corner the market, but

10   when you add the '252, that did it, and that's what -- I mean,

11   when you just look at it, it's not like you went to ten

12   different owners, got ten different patents, bought them all

13   up, and then they've got this portfolio that's the crown

14   jewels.  Here, it looks like four belonged to one entity and

15   one belonged to another, and -- you know.

16       **MR. LEE:**  Your Honor, I think there are three answers

17    to your question.  The first, going back to where your

18    question started, there may be different inferences that can

19    be drawn from the facts.  But on the motion to dismiss, the

20    inference is drawn in favor for the non-moving party.  And

21    those inferences are drawn in favor of us.

22       Number two, you are right that there will be other facts

23   and other evidence.  They'll have their chance to prove that

24   there are other substitutes, that in fact, the anti-competitive

25   conduct they've engaged in is not the result of the

1    aggregation.  But those are issues for resolution after

2    discovery, and not on a motion to dismiss.

3         And number three, the first two propositions I've offered

4    are basic motion-to-dismiss legal principles.  But in this

5    particular instance, we can represent to you more.  We know

6    there are more specifics.  I'm pretty sure that we know there

7    are more specifics because we know of the specifics, and I'm

8    certain that once we get into discovery, you'll see many more.

9         I mean, other judges have remarked publicly that the

10   Uniloc and the VLSI entities are claiming damages in the

11   billions of dollars.  Without disclosing the specific claims.

12   It's out there.  I can give you -- we can give you the specific

13   facts with some discovery.

14        What we've alleged now is what we know specifically, that

15   the aggregations that have occurred under the Fortress

16   umbrella -- not as part of an overarching conspiracy but under

17   the umbrella -- have resulted in aggregation of substitutes.

18   We allege specifically what the substitutes are.  We allege

19   specifically that that's enabled them to achieve

20   supracompetitive royalties.  And that should be enough for us

21   to proceed to prove our case.

22        The issues that Your Honor has raised about how the expert

23   might -- experts might analyze the acquisition prices, how the

24   experts might analyze the damages claims, those are surely all

25   things that need to occur.  But they can't occur on the face of

1   a complaint where all inferences are drawn in favor of the

2   nonmoving party.

3          **THE COURT:**  All right.  Let me ask you one question

4    before I -- I've been with you now about 40 minutes, so I want

5    to give the other side a chance to respond.

6       I'm curious.  You say that you think this Court, meaning

7   me, has jurisdictional authority with respect to compelling

8   disclosure, for instance, under a protective order, et cetera,

9   et cetera, as opposed to or in addition to the host presiding

10  court in the underlying action?

11         **MR. LEE:**  Your Honor, the answer is yes.  But if it

12   required us to go to the court in which the damages claim was

13   made, we'd go to the court in which the damages claim was

14   made.

15      The first thing is mostly these damages claims would

16  become public because they're going to be part of trials.  But

17  the second is this is information in the hand of Fortress and

18  the entities that are parties here.

19      We will, if we can proceed, seek discovery on each of the

20  acquisitions that we know about.  We will seek to confirm the

21  information we have by discovery on the acquisition price.  We

22  will seek information on other acquisitions that we don't know

23  about, but we suspect occurred.  And we'll seek information on

24  the demands that they have made, both in negotiations and in

25  court.  And Your Honor has complete authority to order them to

 1   produce it.

 2        Now, it may be that they claim it's confidential and it's

 3   going to be produced under seal, but Your Honor has complete

 4   authority to do that.

 5             THE COURT:  Is there some reason why you can't allege

 6   on information and belief, obviously, compliant with Rule 12,

 7   or Rule 11, that -- what you've just said?  And that is the --

 8   the value placed in litigation on patents compared to their

 9   acquisition price, without disclosing the precise numbers,

10   were -- you know, I don't know, depends how you describe it.

11   You said orders and orders of magnitude.  I don't know if that

12   means exponential, that means 1,000 times, 100 times, ten

13   times, a million times.

14        Do the -- is there some protective order or some

15   confidentiality agreement that prevents that kind of

16   description?

17             MR. LEE:  Your Honor, I think we -- we don't want to

18   violate the protective orders.  But I think we have alleged

19   just that.

20        If you look at Paragraph 247, to go back to the example

21   you're working on.  If we just look at the first three

22   sentences.

23        (Document displayed)

24             MR. LEE:  (As read)

25             "Intel sought VLSI's permission to disclose (under

1          seal) the damages it claims for Intel's alleged

2          infringement of the '983 patent, as well as the

3          financial terms of its purchase of the patent from

4          NXP; however, VLSI refused that consent.  The damages

5          estimates VLSI has disclosed publicly in connection

6          with its assertion of other patents obtained from the

7          same prior owner against Intel have been exorbitant -

8          as discussed above, VLSI disclosed it would seek

9          $7.1 billion in damages for eight patents and

10          billions in suits against Intel for five patents."

11      So what we've said is:  We have this patent; we know what

12  its acquisition price is.  We can't tell what you it is.  But

13  we can tell you that for all of these patents that VLSI has

14  acquired, or for most of them, they are asserting damages

15  claims in the billions of dollars.

16      So I think, Your Honor, when you said could we say it on

17  information and belief, we said more than on information and

18  belief, because we know it to be true, but we said what we

19  could say without --

20          THE COURT:  Well, but you say it's exorbitant;

21  there's not a relative.  I mean, part of your argument is the

22  fair market value is reflected by the historic acquisition

23  price, which may or may not be true.  There's lots of reasons

24  you can pick stuff up on the cheap.

25      But in any event, you haven't said what -- the

1   relationship -- what magnitude the relationship between the

2   acquisition price -- if that's your theory, the acquisition

3   price as an indicator of the value, and how much value was

4   added by the accretion, by the aggregation, versus the demand..

5   You've just said:  Well, this is exorbitant.

6         **MR. LEE:**  Yeah.  Your Honor, what we've said is:  We

7    know what the acquisition price is.  We know what the demands

8    are.  We can tell you publicly what's been said about demands

9    for other patents that were acquired from this portfolio.  We

10   can tell what you we know about other patents from these

11   folks, and the range of acquisition prices.

12       And then we say, in Paragraph 248:  This is the

13   anti-competitive conduct.  These are the supracompetitive

14   royalties that result from these acquisition schemes.

15       Now, Your Honor, you are correct.  There might be other

16   explanations.  There might be other justifications.  But those

17   other estimations, those other justifications are not things

18   that should be done on a motion to dismiss, but instead, are

19   things that should be done after there's been disclosure of the

20   information we know we have.  And in addition, there is

21   discovery of the additional information that we're pretty sure

22   exists.

23         **THE COURT:**  I'd like to hear from the defendants.  I

24    will say that it still -- it seems to me that there's a string

25    of inferences here.  And that's the question.  You've got to

 1   have a certain degree of specificity, and you've got to show

 2   enough plausibility under *Twombly* and *Iqbal* to reach that

 3   level of a plausible claim.

 4        And here, we have to infer, among other things, that the

 5   historic price -- which we don't know what it is, or at least,

 6   I don't know what it is -- reflects value as opposed to some

 7   other depressant -- suppressant factor like competitive

 8   considerations, which you, yourself cited.

 9        We don't know the value of the -- and I don't know if

10   this -- the '983 was acquired as part of a portfolio, and

11   whether its value was called down or not.  And if it was part

12   of a portfolio, what part of that is attributable to the '983.

13        Similarly, with respect to the demands, you know, do

14   demand really indicate value, or is that just a negotiating

15   ploy?  And if it does indicate some value but there are eight

16   patents involved, five other patents involved in the other

17   case, again there's an attribution or apportionment question

18   there.  it's just a series of inferences, and, and based on a

19   non-concrete number.  Even if I had a concrete number, there

20   might be some inferences.  And you know, inferences,

21   reasonable inferences do have to be drawn in favor of the

22   plaintiff on a 12(b)(6).

23        But it --

24            **MR. LEE:**  Your Honor, if I can respond to that,

25   briefly?

1      **THE COURT:**  Yeah.

2      **MR. LEE:**  If you have two entities at arm's lengths

3   who are competitors, NXP on the one hand, Intel on the other,

4   Apple on the one hand, someone else on the other, the fact

5   that the patentee makes an offer to sell the patent or to

6   license the patent is an indication of its value.  If the two

7   of them shake hands on an acquisition price, that's a pretty

8   good indication of value to the two of them.

9      I'm not saying that there can't be other arguments to be

10  made.  But if I have an actual acquisition price between two

11  independent actors, at least one reasonable inference is that's

12  a pretty good indication of value.

13      And if you have -- I'm going to give you hypothetical

14  numbers now.  If you have an arms'-length acquisition between

15  two independent actors for $1 million, and then two years later

16  nothing happens other than the fact a lawsuit's been filed and

17  the damages claim for that patent is in the billions of

18  dollars, what does that tell you?

19      Well, there's an inference that there has been some market

20  power that has been achieved as a result of the aggregation

21  that has been -- that's being exercised by seeking

22  supracompetitive royalties.  And at that point in time, the

23  defendant has -- the defendant in that case has one of two

24  choices:  Capitulate or defend.  Whichever you do, it's an

25  injury that results from the anti-competitive conduct.

1          And I think, Your Honor, I can -- this is -- goes to your

2     question of what we can say on information and belief.  We've

3     actually said it more specifically.  We've described it in the

4     terms we can without violating the protective orders, because

5     we don't have to say it on information and belief.  We know it.

6     We know what the numbers are.  And we know what the demand are.

7     And the acquisition prices, the actual arms-length acquisition

8     prices for these patents are in the low millions of dollars.

9     And very consistently, the damages demand claims -- now using

10    information that's just public -- across the Uniloc entities,

11    the VLSI entities, are in the billions of dollars.

12         And the question is:  What can account for the fact that a

13    patent that is acquired in an arms'-length transaction for

14    millions of dollars magically transforms overnight into

15    something worth billions of dollars?

16         THE COURT:  And that also depends in part on whether

17    there was aggregation.  So if you bought the same portfolio

18    from Seller X, and then you turn around and you use it and you

19    don't add anything to it but it's already a collection, and

20    then you try to extract something from it, that's not

21    aggregation.  You do have to show that you've acquired --

22    you've amassed things from different sources to put into an

23    aggregated portfolio in order to get that leverage.

24         MR. LEE:  You have -- yes.  That's what we -- I think

25    Your Honor's order says, we have to show -- we have to allege

```
1    for these purposes that we've aggregated substitutes.  And the

2    consequence of aggregating those substitutes is to allow

3    defendants to engage in anti-competitive conduct.

4         And Your Honor, that's what's alleged specifically in the

5    instance we can disclose to you publicly.  It was described

6    generally in terms.  And we've said to Your Honor in the

7    complaint, and I'm as best I can saying it now, we know.  We

8    know what the acquisition prices were.  We know what the

9    acquisition prices were in arms-length transactions between

10   independent entities.  We know what happened after those

11   non-practicing entities acquired these patents, and what

12   demands were made.

13        And maybe there's another explanation for the reason you

14   can extract billions of dollars in royalties for a patent

15   acquired for millions of dollars.  But one explanation, one

16   reasonable explanation, and the explanation we have alleged is

17   that you have by aggregating substitutes amassed market power,

18   and you are exercising that market power to the disadvantage of

19   people like Intel and Apple.

20        (Reporter interruption)

21        MR. LEE:  Extract royalties from folks like Intel and

22   Apple.

23        Thank you.

24        THE COURT:  All right.  Thank you, Mr. Lee.

25        MR. LEE:  Thank you, Your Honor.
```

1      **THE COURT:**  Let me hear from defendants.

2      **MR. ASHLEY:**  Thank you, Your Honor.  Matt Ashley.

3      So I'm going to focus on supracompetitive prices, but I do

4   want to discuss some of the other issues as well.  But I'll

5   start with that because I know Your Honor's interested in it,

6   and I'll try to address some of the things that you asked

7   Mr. Lee, first.

8      First of all, a damage claim in a litigation is not a

9   price.  It's a damage claim.  Now, you just heard a lot of

10  discussion about a damage claim in the VLSI litigation.  What

11  you never heard was that that damage claim would hinge on the

12  acquisition of substitutes.

13     So for instance, you never heard that the damage claim

14  wouldn't be:  Well, this is the value of the technology which

15  is what the jury's supposed to decide and the judge is supposed

16  to oversee.  But, what defendants are doing is seeking a higher

17  value by arguing they have a substitute from some other PAE

18  defendant, using the terminology in the complaint.

19     In other words, the value of the damages claim in the VLSI

20  litigation or any of these litigations will be determined based

21  upon the relative merits of the patent in the case.  Not based

22  on any aggregation.

23     And you also heard Mr. Lee just a moment ago say "extract

24  billions of dollars."  But nowhere in this complaint do they

25  ever allege a fact where any defendant has extracted billions

1  of dollars or even hundreds of millions of dollars or tens of

2  millions of dollars in any pre-litigation demand.

3      **THE COURT:**  Let me ask you to go back to your first

4  point.  Demand does not equal price.  But it may indicate

5  something.  It's not totally irrelevant.  Especially when

6  you're dealing with sophisticated actors in litigation and in

7  the market.

8      So this is not somebody who, you know, slipped and fell

9  and wants to hit the jackpot, and got a bruise, and wants, you

10  know, a billion dollars' damage.  These are sophisticated

11  players with sophisticated counsel.  So you don't go in asking

12  for billions, and making yourself look like a joke in front of

13  a Federal District Court.  Right?  Unless, you know, you've got

14  some basis for it.

15      So even though it may not equal price, and its probative

16  value may be, who knows, slim or less, it's not irrelevant.

17  It's some indication.

18      **MR. ASHLEY:**  I agree it's an indication of the value

19  of the patent, but it's not any indication of the portion of

20  the patent price attributable to the alleged aggregation of

21  substitutes.

22      In other words --

23      **THE COURT:**  That's where you have to draw the

24  inferences that I talk about because Mr. Lee says:  Well,

25  that, you can infer from the history.  The fact that the prior

owners either saw very little value or no value in it, and
suddenly it's -- this thing is worth the subject of a
billion-dollar lawsuit.  That's part of his argument.

You --

**MR. ASHLEY:**  Yeah, that's part of his argument --

**THE COURT:**  -- the acquisition price, and it was
acquired at a rate of -- I don't know what, because it's all
secret.  But the representation is many orders different in
magnitude in terms of level of price compared to what's being
asserted in the action.  And, it follows from some aggregative
activity.  So that's why I went through, looking at some of
these.

In some of these, the aggregation look more extensive than
others.  In one case, the first one I mentioned, there wasn't a
whole lot of aggregation.  Four already belonged in one
portfolio, and then you add one.  Others look like, yeah, you
got two from here and one from there, you know, looks like
there's some aggregation.

And none of these cases talk about an interplay of other
patents outside the field, so I'm assuming the aggregation
we're looking at is within each market.  And so if you're
looking, you know, at the network-based -- the voice messaging,
you look at only those patents to see what kind of aggregation
there was.

So that's -- that's Mr. Lee's argument.  That from history

```
 1   and the fact of aggregation, sort of the sequence of things,
 2   you can infer that something happened.  Something transformed
 3   that little speck into something much bigger.
 4         MR. ASHLEY:  I understand the argument.  I think it's
 5    not just an inference; it's not just a series of inferences.
 6    I think it's speculation.
 7         And let me just address one example that Mr. Lee spent a
 8   lot of time on, which was the transfer from NXP to VLSI.  Let's
 9   remember that in this case, out of all the litigation that's
10   complained of, there's only one series of litigation against
11   Intel in the entire complaint.  And that is the VLSI case.
12         In the alleged conspiracy count, there is not a single
13   allegation that any of the parties that apparently are filing
14   these lawsuits have filed a suit against Intel, other than
15   VLSI.
16         And in addition -- now, this was in the prior complaint --
17   there was an admission that all of the patents-in-suit in the
18   VLSI case came from NXP.  They weren't gobbling them up from
19   many different locations.  They were already collected in the
20   pile.  That was at the original complaint, Paragraph 86.  They
21   say, quote (As read):
22               "The patents at issue in these suits constitute only
23               a fraction of the original portfolio owned by NXP."
24         So in fact, it was a de-aggregation when VLSI obtained a
25   fraction of NXP's patents, and then later asserted them.  It
```

1  doesn't fit their paradigm at all.

2      In addition, in the original complaint at Paragraph 127,

3  they said, quote (As read):

4          "NXP would have been capable of licensing to third

5          parties the patents that it transferred to VLSI."

6      Close quote.

7          **THE COURT:**  But the current complaint, if we're

8  looking at the shared memory access, that's where the VLSI --

9  it identifies three patents as the substitutes.  The '687, the

10 '850 and the '98- --

11         **MR. ASHLEY:**  Which paragraph are you looking at,

12 Your Honor?  I'm sorry.

13         **THE COURT:**  I'm looking at Paragraph 236 that

14 identifies among substitute patents defendants have aggregated

15 Shared Memory Access Patents No. '687, '850 and '983.

16     Paragraph 236.  Do you see that?

17         **MR. ASHLEY:**  Yes.

18         **THE COURT:**  And then it goes on and described where

19 those came from.  So the '687 appears to have come from kind

20 of a long chain but -- Phoenicia, I guess?  From Pendragon to

21 Phoenicia, and then Phoenicia to Uniloc.  Uniloc Luxembourg,

22 Uniloc.  But it came into this group through Phoenicia.

23     The '850, if you follow that one, looks like that came

24 through Phoenicia, then to Pendragon Electronics.  So -- but it

25 looks like it came from a slightly different -- I don't know

1   what the relationship between Phoenicia and Pendragon is.

2         And then, the '983 came from NXP.

3         So that is an example of an aggregation of three different

4   patents, the '687, '850, '983, that weren't all part of one

5   portfolio that was held by one prior owner.  It seemed to have

6   come from -- two of them are somewhat related; I don't know

7   exactly what.

8         So that's an example of what the plaintiffs would call

9   aggregation, I guess.

10        **MR. ASHLEY:**  What I was trying to explain,

11   Your Honor, is the paragraphs you just looked at deal with

12   Uniloc.  Uniloc has not sued Intel.

13        The only lawsuit against Intel alleged in the entire

14   complaint or the prior complaint is by VLSI.  VLSI's patents at

15   issue in that case -- I don't think plaintiffs will dispute

16   this -- all came from NXP.  From a si- --

17        **THE COURT:**  No aggregation.

18        **MR. ASHLEY:**  No aggregation.  They don't dispute

19   that.  Those facts.  And I'm getting a little bit in the weeds

20   here, because I really want to take a step back.

21        I started with saying that a damage claim is not a price.

22   I understand that they have a theory of how you can attribute

23   it to a price.  But it is, in fact, not a price.  Just like

24   demand is a demand.  It's not a price.

25        And every allegation -- we noted this in our motion.

1    Every allegation that they are referencing right now about VLSI

2    and what they are demanding in litigation was also alleged in

3    the complaint you held deficient.

4         So for instance, Mr. Lee spent time on Amended Complaint

5    Paragraph 335.  That was, in the original complaint, Paragraph

6    102.  What we pointed out was they just repeated multiple times

7    throughout their complaint.

8         And then what they do -- and I think you've spotted

9    this -- is they then say that defendants have demanded in

10   litigation amounts for patents that are different than the

11   prior owner of those patents has demanded for other patents.

12   And I think you called that apples and oranges.  And Mr. Lee

13   said that it was not.  But in fact, it is.

14        There are any number of reasons why somebody would seek in

15   litigation an amount for a patent that differs from what

16   somebody else would license or seek in litigation for a

17   different patent.  That's not an inference, Your Honor.  That's

18   pure speculation, and an illogical leap.

19             **THE COURT:**  Well, Paragraph 335 stands out in my mind

20    because that -- that is one instance -- and I think there's

21    only one other that I could find, where, here, it says

22    Freescale offered Intel a license of $10 million dollars for

23    patents that included the '303.

24        So at least, at least the -- the subject substitute --

25   putative substitute patent that's at issue here as part of the

1  aggregation argument was part of a prior proposed transaction,

2  although it was one part of the larger portfolio, it seemed, so

3  that you've got the -- you do have the apportionment question I

4  raised.

5       But at least that one, it's not just -- unlike most of the

6  other complaints where they said:  Well, they offered to sell

7  this group of patents in this general area for X, but none of

8  those patents are the same as the one that are at issue here.

9  This is one -- I think there's one other instance that I could

10 find in this 134 pages -- where the actual patent at issue as

11 part of the -- I'll call it the "accused patents" in the sense

12 of accused of the antitrust violation -- was part of a specific

13 earlier proposed transaction.

14      At least, to me, that has some more probative value than

15 complete apples and oranges.

16      **MR. ASHLEY:**  And I think, Your Honor, you've focused

17  on that paragraph, I'm pretty sure -- I'm looking right now,

18  but I'm pretty sure that's the same paragraph you focused on

19  in your order in connection with the complaint.  I believe

20  it's the same.  I think it's Paragraph 102.  We'll double

21  choke it.  But, you mentioned all of this before.  You saw the

22  same thing in the prior complaint.  They have exactly one

23  example.  And then, they're trying to dress that example up

24  with this:  Oh, we don't know enough detail.

25      But the core argument is:  VLSI is seeking more in

litigation than somebody else might have been willing to take
prior to litigation.  But there's any number of reasons why
that's the case.  It wasn't good enough for the prior
complaint; it isn't good now.  And all they've done is add a
bunch of other allegations where -- they're really slick about
it usually, but they don't make it clear that what they're
talking about is a comparison of a litigation demand for one
patent, based upon alleged pricing of other patents.

        **THE COURT:**  Well, the word "other" is used in -- it
is used.  And I circled it when I went through.

        **MR. ASHLEY:**  It is --

        **THE COURT:**  That's when I said "apples and oranges."

    But, what about Mr. Lee's point?  They have information
which they can't obtain or disclose at this point that the
acquisition price of the actual patents at issue here is so
dramatically different than what is being asserted in terms of
the value in litigation, that that shows that there is a before
and an after.

    What's your response to that?

        **MR. ASHLEY:**  Buying low and selling high is basic
economics.  It is not a proper inference that somebody has
market power, much less that somebody has market power based
on something the antitrust laws were intended to prevent.

    You mentioned several times to Mr. Lee that the core
failure in that is that -- what is causing that supposed

increase in bargaining?  Is it just a better negotiator?  A

more aggressive negotiator?  Is it someone who can withstand

the massive amounts of dollars that it takes to prosecute an

infringement case against the likes of Apple or Intel?  Is it

somebody who has a different infringement theory?

     And there is no answer to that, because they're

speculating if they say: Well, the patent was purchased at one

price, and it's being litigated at a different price.  That

happens every day.  There's nothing anti-competitive about

that.  There's nothing inferentially anti-competitive about

that.

     What they said in their prior complaint and what they

claim to say in this complaint is that it was the acquisition

of substitutes that supposedly led to the ability to achieve

those prices.  And I'm going to assume -- I'm going to credit

for now that demanding it means you've achieved it.  That

seeking it in litigation means you've obtained it.

     They have not alleged enough facts to show -- and I think

the terminology Your Honor used is that anybody was over a

barrel, and they capitulated and paid a price that was droves

higher than the value of the patents.  And -- or -- or that

they have nowhere to go.  That they must enter into a license

because we have essentially cornered the market.  They don't

allege anything like that.

     What they allege is that defendants have obtained a

1    couple, a few, a handful of patents that pertain to the same

2    general area of technology.  And they used one example over and

3    over in their slides.  One of the more technical examples.  But

4    they always ignore other examples, like health monitoring.

5        And the notion that if you obtain three or four patents

6    that relate to monitoring health, it gives you market power in

7    that market or any market, it's not an inference.  It's rank

8    speculation.  And it's not based on any allegations of fact,

9    actual fact that matter, that weren't extant also in the

10   deficient complaint.

11       I also want to note that the entire theory that because

12   somebody seeks a higher price for a patent than a prior owner

13   sought, is -- has been rejected by the Ninth Circuit as

14   something based on competition laws.

15       In *Qualcomm*, the court addressed this very type of

16   argument about basically charging too much in licensing

17   negotiations for a patent.  This is at 969 F.3d, 974.  And the

18   pin cite is 999.  And the court says, after noting that this

19   theory fails as a matter of law and logic, the Court said,

20   quote (As read):

21            "A second problem with the District Court's

22            unreasonable royalty rate conclusion is that it

23            erroneously assumes that royalties are

24            anti-competitive in the antitrust sense unless they

25            precisely reflect the patent's current intrinsic

1              value and are in line with the rates other companies

2              charge for their own patent portfolios.  We decline

3              to adopt that theory of antitrust liability."

4      So it's just not a viable antitrust theory to say: Because

5  somebody else charged less for it or because somebody else

6  charged less for different patents, that that therefore shows

7  there was some anti-competitive pricing.

8          **THE COURT:**  No; that, alone, would not.  On the other

9   hand -- seems to me the plaintiffs have to make two showings

10  with respect to pricing.  One, that there was supracompetitive

11  pricing.  Two, that it was due to anti-competitive behavior.

12      And, you know, the difference between acquisition price

13  and assertion price, difference between what others sort of

14  offer to pay and the assertion price, you know, that may inform

15  the question of whether or not -- I still have a question about

16  that, but that might inform the first element, whether or not

17  there's above-market pricing.

18      That doesn't tell you what the cause is, and we've talked

19  about that.  The cause and the difference may be due to some

20  other factors, like you mentioned, or it may be due to the

21  aggregation.  And there, you know, you look to the sequence of

22  things.  The history.

23      And it seems to me timing, sequence, how much aggregation

24  there was, you know, makes a difference.  If you inherited the

25  whole portfolio and there was no aggregation, it is a little

1   different than you acquired ten different key patents, the

2   crown jewels from ten different sources, and then put them all

3   together and got this synergy.  So that informs that.  And then

4   the availability of substitutes.  Because even if you amass and

5   aggregated some substitutes, but like I said, it was only two

6   out of 20, and the other 18 are just as good, unlikely that the

7   increase in price was due to the aggregation.

8        So it all -- I know it informs the definition of market

9   power, but it all sort of relates.  To draw the inference on a

10  causation due to anti-com- -- you have to find those factors.

11            **MR. ASHLEY:**  Your Honor, (inaudible).

12            **THE COURT:**  It's not saying -- irrelevant.  I think

13   price paid versus price sought is a factor that goes to the

14   first question.

15            **MR. ASHLEY:**  Yeah.  And they had one paragraph on

16   that that was really -- and like I think you said, there was

17   might have been another one in there, but in this long,

18   drawn-out complaint they have maybe one or two anecdotal

19   paragraphs that were extant in the original complaint that the

20   Court found deficient.  The rest of it is just the

21   apples-and-oranges comparison.

22        And I note that when you ask the question:  Well, why are

23   you even comparing the -- I think it's the '983, but whatever

24   patent is actually at issue in the antitrust case with these

25   others, the answer was:  Well, they're sort of the same

technology.

Well, if they're sort of the same technology, then why wouldn't they be substitutes, under plaintiffs' theory?  And if they're so cheap, right, abuse they're comparing them against the patent that is being asserted by VLSI, then why don't they buy those cheaper substitutes?  They have substitutes available, even under that circular theory where they're listing the apples and oranges as a basis for supracompetitive prices.

And we noted, Your Honor, in our motion, we were very specific to say:  This is what's new in the complaint, the amended complaint, compared to what was in the deficient complaint.  And we pointed out, you know, this paragraph -- I believe Paragraph 102 that's in your order at Page -- you discussed it in your order at Page 15, Lines 7 through 11. That's what I believe is now Paragraph 335 of the amended complaint.  So, it's just the same thing again.  And then, all you're left with for their additional purported facts of supracompetitive pricing is these apples-and-oranges comparisons that you noted.

And then with respect to the deficiency you found in the original complaint that they didn't allege that they had basically been -- the market had been cornered, or that they didn't have any other substitutes available, you used a lot of different language that was, in my opinion, very, very clear,

1   what did they do?  They identified 13 what they call exemplar

2   markets.  And they picked a couple substitutes.

3       Even if you credit that, say, for instance, a patent that

4   monitors a sleeping baby's -- for suffocation with a patent

5   that monitors exercise, even if you assume that they are

6   economic substitutes, it doesn't mean that that would drive --

7   that if you -- if you charged less for -- I'm sorry -- if you

8   reduced the output of one it would change the price of the

9   other, or if you increased the price of one it would reduce the

10  output of the other.  So they don't have any actual

11  substitution allegations.  It's -- to the extent that address

12  your order's issue.  Which was not simply identify a couple of

13  substitutes, but identify facts that would show you don't have

14  any other substitutes available.

15      Your Honor, I'm happy to discuss supracompetitive pricing

16  some more, any other questions you might have on it.  But I

17  would also like to discuss a point you mentioned very early on,

18  on output, which is one of the prongs of --

19          **THE COURT:**  I was going to ask Mr. Lee to identify or

20   what his position is with respect to any allegations as to

21   reduced output.  I understand the law about, you know, having

22   to show direct anti-competitive effect.  And there's -- some

23   courts use a disjunctive, some use the conjunctive, and I

24   understand the debate about that.  But just as a factual

25   matter, given the length of this complaint, I want to make

1    sure I'm focusing on the right areas.

2        Is there an assertion here of an actual output diminution?

3        **MR. LEE:**  Your Honor, I think the focus of the

4    specific allegations of anti-competitive effect are the

5    supracompetitive royalties and supracompetitive royalty

6    demands.  We do say that it reduces output, but we haven't

7    given you specific examples of the reduced output.

8        It does reduce output when you have aggregation of the

9    substitutes, and you cannot go to the different holders of the

10   patents to get licenses.

11       So the focus -- first, I think it's disjunctive, it's not

12   conjunctive.  And I think the focus of what we've alleged is

13   the supracompetitive royalties.  But we also have the

14   allegations that indicate the result of the aggregation is

15   reduced output.

16       Let me just say as to the first part of the

17   supracompetitive royalties, to make two points to the

18   discussion you were just having with Mr. Ashley.

19       Your Honor, the chronology is critically important.  And

20   as Your Honor knows from not just cases like this, but from

21   many other cases in a variety of disciplines, chronologies and

22   the order of events tell us a lot.  And when you have an

23   acquisition between two independent parties acting arms'-length

24   on the purchase price, that tells you a lot.  And one of the

25   inferences is the inference that we're asking to you draw.

1        When nothing is done with the patent for a period of

2   years, there are inferences that can be drawn from that.  Some

3   of them are helpful to us; there may be others.  But the

4   inference that can be drawn now is the one that favors the

5   non-moving parties.

6        As I candidly -- and respectfully to Mr. Ashley -- I don't

7   get the argument that the demand that is made in a Federal

8   District Court for damages for a specific patent is unrelated

9   to value.  That damages demand is supposed to be a reflection

10  of the hypothetical negotiation between a willing licensor and

11  a willing licensee.

12       I'm quite sure that none of us on this call would just

13  willy-nilly make damages demands that aren't tethered to what

14  we think is a demonstrable negotiation between a willing

15  licensor and willing licensee.

16       So the chronology is patents in the hands of the original

17  patentee, nothing done with them, sold for pennies on what are

18  now the dollars into the hands of a non-practicing entity, and

19  magically transformed into something that is valued at billions

20  of dollars.

21       And as I said to you, we know some of this from

22  information under seal.  There is -- my colleagues reminded me

23  there is a case pending before Judge Marachi (sic) that

24  involves Uniloc and Apple.  And in the transcripts -- the

25  Docket No. is 19-cv-01692.  But even in the transcripts in the

hearings that have occurred in the last month or two, it's
quite clear that the damage claim which is in the billions of
dollars is three orders of magnitude more than the acquisition
price.

Those are the reasons that we know that once we have the
discovery we want, we're going to be able to provide Your Honor
with a whole series of examples that have the same chronology,
a whole series of examples that give rise to the same
inferences.

And Your Honor, at the end of the day, when you have a
single (inaudible) Fortress and its web of companies who are
engaging in transactions, all of which have this chronology,
all of which have the same effect, all of which result in the
transformation of a patent with low value into something that
all of a sudden becomes worth billions of dollars, there are
reasonable inferences.  And the mostly compelling inferences
are that there has been market power amassed as a result of the
aggregation that's being exercised in an anti-competitive way.
That's what we've alleged.

I think many of the points that Mr. Ashley is making, some
of the discussion you and I had, they may be issues that we'll
lose after discovery.  They may be issues that we will prevail
on on summary judgment, or we'll lose on on summary judgment.
But, they're not issues that should be decided on the motion to
dismiss.

1      I think that if you take what Mr. Ashley described as the

2    series of events, in fact, the most reasonable -- I mean, why

3    do we think Fortress is entering into these transactions that

4    transform something from pennies to billions?  Right?  There's

5    a reason that someone as sophisticated as Fortress is doing so.

6    And it's because in doing so, they acquire market power that

7    allows them to extract amounts of money that they could -- the

8    prior owners either could not or would not seek, themselves.

9          **THE COURT:**  Let me ask you -- I have one question for

10    you Mr. Lee, and one more question for Mr. Ashley.

11      Mr. Lee, is there some reason why you don't have more

12    specific allegations about what we have referred to as the

13    crown jewel issue, that the three substitutes you've identified

14    for the shared voice messaging or the five substitutes you've

15    identified for, you know, various things, why there's no

16    allegation that this is really the -- these are the key, key to

17    the -- there are no other great substitutes out there; these

18    are the crown jewels?

19          **MR. LEE:**  So Your Honor, if we were trying to prove

20    market power circumstantially, then we might have to make that

21    allegation.  But when we're not trying to prove it

22    circumstantially, and what we're saying is there are direct

23    anti-competitive effects in the marketplace --

24          **THE COURT:**  I understand normally that goes to market

25    power, et cetera.  On the other hand, it is probative on the

1    question of whether you've shown supracompetitive pricing.

2    Because the more of a crown jewel it is, the more easy it is

3    to infer that what -- once acquired and once aggregated, that

4    aggregation has real impact in getting Fortress their

5    supracompetitive pricing.

6        If they're not much value, if they don't take up -- you

7    know, they're not the crown jewels, then it's harder to infer

8    that the increase is due solely to the aggregation.  So it is

9    relevant not just -- I understand.  The normal way, it only --

10   it informs market share, market power.  And I'm not necessarily

11   talking about that.  I'm saying it has its own probative --

12   independent probative value as it goes to whether or not you've

13   made enough of an inference here of supracompetitive pricing.

14       So my question is:  Is there some reason why you can't --

15   why that's not alleged?  Can you allege that?

16           **MR. LEE:**  Is there some reason we have to allege that

17   the precise patents that we've identified as substitutes are

18   the crown jewels?  I think the answer is -- and I say this

19   respectfully.  The answer is we didn't think we had to.

20   Because we're alleging direct market power.

21       Now, Your Honor's right.  It will be probative of the

22   issues to be decided, when the case is litigated.  But I don't

23   think it's an issue for a motion to dismiss.  The fact -- so

24   many of --

25           **THE COURT:**  Let me ask you this.  If I disagreed with

 1  you, would -- would you deserve a chance to amend to add those

 2  facts in?  Or would you stand on what you've got?

 3          **MR. LEE:**  You know, Your Honor, I think to answer

 4  that question I'd have to talk to some folks that are smarter

 5  than me.  And, to be sure that I knew precisely what we

 6  could -- could amend.  I certainly would want a chance to talk

 7  to our folks before we responded.

 8          **THE COURT:**  Sure.  Okay.

 9          **MR. LEE:**  But Your Honor -- and the reason I'm

10  hesitating is this.  I think if the basis for an order

11  dismissing was that we had to specifically allege that the

12  substitutes that were aggregated were the crown jewels, even

13  with allegations of direct market power, I'm not sure that's

14  not an issue that we'd like -- you know, that rather than try

15  to come up with a serious allegation that might satisfy you,

16  that we wouldn't just decide --

17          **THE COURT:**  Sure.  Well, several alternatives.  All

18  right.

19          **MR. LEE:**  Yeah, yeah.

20          **THE COURT:**  Let me ask Mr. Ashley, to go back to

21  Mr. Lee's point about access to the information that he says

22  is quite critical and quite probative, I understand you think

23  maybe it's not so probative because, you know, you buy low,

24  sell high.  I mean, you do that with stocks, with real estate;

25  why not patent, right?  On the other hand, you know, an

1    inference can be drawn, or least it's part of an inference.

2        What's your assessment of -- of the ability of plaintiffs

3    to get access, at least for purposes of filing under seal this

4    kind of information?

5        **MR. ASHLEY:**  I'll start with the fact I think it's

6    irrelevant.  It's just not relevant to determining any issue

7     in this case.

8        Second, and more importantly, *Twombly* indicates that

9    you're required, as a plaintiff -- and that was an antitrust

10   case -- to plead facts supporting your position.  And you're

11   supposed to do that before you get discovery.

12       *Twombly* has, actually, an extensive discussion of why you

13   require, in particular, antitrust plaintiffs do this before

14   opening the doors to what is enormously expensive discovery.

15       **THE COURT:**  Well, of course, the discovery here is

16    very limited.  It'd be lifting the seal on very particularized

17    pieces of information.  So I understand *Twombly* is designed to

18    prevent the burdensome aspect of broad-based discovery in the

19    potential extortionate impact of threatening, you know, broad

20    discovery and transaction costs, et cetera, et cetera.

21       But if -- if there's a -- specific pieces of information

22   -- so it's not really a burden.  I mean, I don't think you're

23   asserting it's a burden to disclose, right?

24       **MR. ASHLEY:**  That wasn't -- my point was:  You are

25    supposed to be able to state an antitrust claim before

1    discovery.  You're not supposed to ask for discovery so you

2     can state an antitrust claim.

3        But more importantly, I just think this is an instance in

4    which they saw fit to put the allegation of our refusal to

5    provided the information to them in their complaint.

6        Instead, if they thought it was important or pertinent to

7    anything that they needed to allege in this case, or that they

8    were ever going to use in this case, they should have engaged

9    in whatever activity they needed before the District Court in

10   those very -- those protective orders were stipulated

11   protective orders, and sought relief from it.  Instead, they

12   chose to reference this in the complaint -- it's not like they

13   missed this issue -- referenced this in the complaint, and then

14   try to rely on that as a basis to avoid a dismissal.  So I do

15   believe it's a sideshow.  And I believe it's irrelevant.  And

16   that's the reason why I'm saying it should not prolong this

17   case.

18        But I also think that the notion that they now come to

19   you -- and -- and this is the second complaint.  But remember,

20   Intel filed a complaint before this, almost an identical

21   complaint before another judge, that they then dismissed before

22   they brought this one.  This is something they could have

23   spotted if they thought it was a real issue.  It's not a real

24   issue.  And it shouldn't prolong this case.

25        And I also want to address a few things that Mr. Lee did

```
 1   not say.
 2           MR. LEE:  Your Honor, before we move to a different
 3   point, could I just address the point that Mr. Ashley just
 4   made?
 5           MR. ASHLEY:  Mr. Lee, I let you speak for, like, 45
 6   minutes.
 7           MR. LEE:  Okay, I'm sorry.  I'm sorry.  Go ahead.
 8         THE COURT:  I'll let you conclude, but I'm going to
 9   conclude this hearing pretty soon.  So I'd like -- whatever
10   point you're going to make, I'd like you to make it quickly.
11         MR. ASHLEY:  I will.
12         THE COURT:  I know there's lots of issue that I'm
13   unfamiliar with.  There's 50 other issues we could talk about,
14   but --
15         MR. ASHLEY:  Yeah, I'm not going to go into the
16   Section 1 failings and stuff like that.  I'm just going to
17   stay on the topic of what Mr. Lee did address.
18         THE COURT:  Yeah.  Okay.
19         MR. ASHLEY:  He said that all of the VLSI patents
20   that he keeps talking about and that would be the issue of
21   this damages report were obtained from a single entity, NXP,
22   who they alleged had tens of thousands of patents.  It's not
23   aggregation by Fortress or VLSI.
24     I also said that there was not a single allegation in the
25   entire amended complaint along the lines of prior Complaint
```

Paragraph 102 that you addressed in your order, other than those allegations that Your Honor has been referring to as apples and oranges.  And there was no retort to that.

I also said that their theory has boiled down to: Defendants acquire a couple or handful of substitutes in a market, with no delineation of how many other substitutes remain.  And they don't contend otherwise.  That's not in compliance with your order.  It's not in compliance with basic economic theory of what might give you market power.

And in addition, not only do they not say that these are the crown jewels; remember, Your Honor, their theory is these are weak patents.  Which means invalid, not infringed, and easily designed around.

**THE COURT:** All right.  All right.  Thank you.

I'll let you close, Mr. Lee.

**MR. LEE:**  Your Honor, three quick points.

Mr. Ashley keeps coming back to Paragraph 102 of the original complaint, and suggesting that we have done nothing to amplify the allegations.  I would just ask you to compare Paragraph 102 of the original complaint, which is four sentences long, to Paragraph 335, which consumes more than a full page with details that are nowhere found in Section 102.

Point number two.  We did have the information before we filed the complaint.  We didn't need discovery to get it.  We know it's there as factual matter.

1       And number three, we asked Fortress for permission to

2   disclose the information to you.  They said no.

3       If it really is irrelevant, if it doesn't demonstrate

4   precisely what we have argued to Your Honor, let us show it to

5   you.  Give us permission to show it to you.  The only reason

6   they're not willing to show it to Your Honor is it is a

7   compelling real-world demonstration of precisely what we have

8   alleged in the complaint.

9           **THE COURT:**  Let me ask you just to respond to this

10   one thing about the -- that the entire portfolio, at least

11   relative to Intel, the VLSI came from NXP, and therefore,

12   there was no aggregation.  What's your response to that?

13           **MR. LEE:**  So Your Honor, it's come to NXP -- first,

14   some of these originated with Freescale, then they went to

15   NXP.  Some of them are NXP-related.  They didn't just all drop

16   into VLSI's lap on one day.  These have been a series of

17   acquisitions over a period of time where VLSI has gone out to

18   get patents from NXP, and aggregate them with patents they had

19   previously acquired from NXP, to assert.  And in the process,

20   they are not just asserting -- they are asserting those

21   patents, but also threatening to assert other patents owned by

22   other Fortress entities.  This is not Intel just worried about

23   VLSI.

24       Nor is Apple just worried about Uniloc.  Apple and Intel

25   are worried about this course of behavior that results in one

1  entity suing Apple 25 times, one entity suing Intel 23 times.

2  And they're out there aggregating new patents on a daily basis,

3  because we know about it from public sources, patents that have

4  been acquired since the time of Your Honor's order.

5      And I would bet you my bottom dollar they're going to come

6  after Apple and Intel again.  Which is why we bring the case to

7  Your Honor, and why we think that there is enough to proceed.

8      **THE COURT:**  All right.  Thank you, counsel.  I'll

9   take the matter under submission.

10     The arguments have been helpful, and I appreciate the able

11  assistance of counsel on both sides to this matter.

12     **MR. ASHLEY:**  Your Honor, may I give you one case cite

13   that you -- you might want to look at?  It's plaintiffs' case.

14   *It's Rebel Oil*, 51 F.3d, 1421, at 1434.

15     And it speaks to the question of whether or not you have

16  to have both supracompetitive prices --

17     **THE COURT:**  I'm familiar with that.  And I understand

18   the ongoing debate about the "both" or "or."  All right, thank

19   you.

20     All right, I'll take the matter under submission.  Thank

21  you, counsel.

22     **MR. ASHLEY:**  Thank Your Honor.

23     **MR. LEE:**  Thank Your Honor.

24     (Proceedings concluded)

25

### **CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.


_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Wednesday, December 31, 2020